# AFFIDAVIT

I, Justin Stern, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I have been a Special Agent with the FBI since December of 2004. I am the primary Case Agent for this investigation. As the primary Case Agent, I am familiar with the facts of the case. As a part of my training, I received seventeen weeks of investigative training at the FBI Academy in Quantico, Virginia. Since completing training, I have participated in numerous criminal investigations. These investigations have utilized physical and electronic surveillance, financial analysis, interviews, surreptitious recordings, undercover operations, search warrants, arrests, utilization of informants, seizure and analysis of computer information and various other techniques. I am currently assigned in Boulder, Colorado; a small satellite office of the FBI's Denver Division. In this capacity, I am responsible for investigating all federal criminal violations under the FBI's purview. During my career with the FBI, I have investigated organized crime, drugs, gangs, violent crime, firearms, financial crime and money laundering for the majority of my career.

2. I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, LLC and Microsoft Corporation (hereafter "Google," "Microsoft" or "Provider") to disclose to the government records and other information, described in **ATTACHMENTS B and D**, that constitute evidence, fruits and instrumentalities of violations federal laws relating to fraud and identity theft, including 18 U.S.C. §1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud) and 1028A (aggravated identity theft ), federal firearms laws including 18 U.S.C. § 922 (unlawful possession of a firearm by a felon), and federal controlled substances laws including 21 U.S.C. § 841(a) (distribution of controlled substances) and 843(a)(3) (obtaining a prescription by fraud) (hereinafter the "SUBJECT OFFENSES,") including the contents of communications, associated with the email accounts ███████@gmail.com; **shawn.vencel@outlook.com** and ███████@outlook.com (hereinafter the "SUBJECT GMAIL ACCOUNT" and "SUBJECT SV OUTLOOK ACCOUNT" and SUBJECT CS OUTLOOK ACCOUNT) described in **ATTACHMENTS A and C** that are stored at premises owned, maintained, controlled, or operated by: Google, a company located at 1600 Amphitheatre Parkway, Mountain View, California 94043; and Microsoft, a company located at 1 Microsoft Way, Redmond, Washington 98052.

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES are located in the places described in **ATTACHMENTS A** and **C**. Witnesses and victims, whose true identities are known to me, are identified in this affidavit by reference to their respective titles and roles.

1

4. The facts set forth in this affidavit are based on my personal knowledge as the investigation's Case Agent; my training and experience; knowledge obtained from other individuals including law enforcement officers/personnel; and my review of reports and other evidence. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge.

## THERE IS PROBABLE CAUSE TO BELIEVE THAT SHAWN VENCEL COMMITTED THE SUBJECT OFFENSES

5. On October 8, 2019, I initiated an investigation of SHAWN MICHAEL VENCEL based in part, by information, evidence and investigation conducted by local Colorado law enforcement agencies, including: Boulder County Drug Task Force; Boulder County Sheriff's Office; Boulder Police Department; Broomfield Police Department; and Arvada Police Department. My investigation concerns VENCEL's various alleged criminal activities such as: fraudulent acquisition of large quantities of prescription medication, specifically oxycodone; identity theft and defrauding of an individual known to me but identified in this Affidavit as IDENTITY THEFT VICTIMS 1 and 2, and concurrent defrauding of financial institutions, other businesses and individuals; prohibited possession of firearms and ammunition; and other acts. I note that IDENTITY THEFT VICTIM 1 is a physician.

**I.    There is probable cause to believe that SHAWN MICHAEL VENCEL has fraudulently adopted the identity of IDENTITY THEFT VICTIM 1 to commit bank and wire fraud having also committed bank fraud using his own identity.**

6. I have reviewed information from Broomfield Police Department case number 2019-00022774. The case describes the following incidents:

   A. On or about April 19, 2019 an employee of VICTIM CAR DEALERSHIP 1 reported that an approved loan in the amount of $52,514.04 on April 1, 2019 was fraudulent. The loan had been obtained by a man using the name of IDENTITY THEFT VICTIM 1 and presented a Texas driver's license in IDENTITY THEFT VICTIM 1's name as well as supporting documents bearing IDENTITY THEFT VICTIM 1's name; specifically, a supposed waste management service bill and automobile insurance. The man used IDENTITY THEFT VICTIM 1's identity to purchase a grey Ford F150 pickup truck. Later, on April 26, 2019, another employee of VICTIM CAR DEALERSHIP 1 was shown a photo array that included a photo of SHAWN MICHAEL VENCEL. The employee identified VENCEL as the person who had taken out the loan as IDENTITY THEFT VICTIM 1.

   B. I have reviewed the fraudulent loan application. The loan application provided IDENTITY THEFT VICTIM 1's telephone number as 720-725-8189. The loan application was signed April 1, 2019.

   C. On April 25, 2019, a Broomfield Police Department (hereinafter BPD) Detective identified and interviewed IDENTITY THEFT VICTIM 1 in Texas. IDENTITY THEFT VICTIM 1 reported that he had filed a police report with the Houston Police

2

Department. IDENTITY THEFT VICTIM 1 said: he did not know SHAWN MICHAEL VENCEL; that VENCEL had attempted to purchase several automobiles; opened numerous credit cards: and attempted to lease rental property using IDENTITY THEFT VICTIM 1's identity. IDENTITY THEFT VICTIM 1 later sent the detective a list of inquiries and calls related to fraudulent activity on IDENTITY THEFT VICTIM 1's credit report, which included multiple inquiries regarding: credit cards; bank accounts; car loans; a rental property; and a Sallie Mae loan.

        D.      On April 26, 2019, a BPD Detective received a call from VICTIM REAL ESTATE AGENT 1. VICTIM REAL ESTATE AGENT 1 explained that a man representing himself to be IDENTITY THEFT VICTIM 1 had tried to rent a residential property in Superior, Colorado. VICTIM REAL ESTATE AGENT 1 became suspicious, in part, by some of the man's statements concerning his supposed medical training and experience as a physician. VICTIM REAL ESTATE AGENT 1 then located and spoke to the real IDENTITY THEFT VICTIM 1 in Texas, who said that IDENTITY THEFT VICTIM 1 was the victim of identity theft.

        E.      On April 30, 2019 BPD Officers interviewed SHAWN MICHAEL VENCEL when he arrived at VICTIM CAR DEALERSHIP 1 driving the Ford F150 pickup truck he obtained using a loan in IDENTITY THEFT VICTIM 1's name. VENCEL identified himself using his real name and presented a Colorado identification card. VENCEL told the Officers that the Ford F150 pickup truck belonged to his boss, IDENTITY THEFT VICTIM 1, and that he and IDENTITY THEFT VICTIM 1 worked at a company called Mile High Defenders. VENCEL said that he had purchased the Ford F150 pickup truck for IDENTITY THEFT VICTIM 1. Moreover, VENCEL stated that VENCEL and IDENTITY THEFT VICTIM 1 were "basically brothers." VENCEL initially denied driving the Ford F150 pickup truck to the dealership, but eventually admitted it. Upon concluding the interview, the Officers arrested VENCEL.

        F.      BPD Officers searched the Ford F150 pickup truck SHAWN MICAHEL VENCEL drove to VICTIM CAR DEALERSHIP 1. Officers found two baggies with substances that field-tested positive for heroin, meth, and suboxone.[1] In the bed of the truck the officers found sporting goods, as well as two soft cases containing ammunition. One of the cases contained eight loaded magazines. Seven of the magazines were thirty-round magazines

---

        1 Unless otherwise explicitly stated, all of the illicit controlled substances described in this affidavit field/presumptive tested positive for the presence of the represented drug. Field/presumptive tests are not always accurate. They are nevertheless helpful to law enforcement because they provide additional information showing that a substance, present with other drug paraphernalia or in circumstances consistent with illicit drug use, is actually a controlled substances. When a field/presumptive test corroborates suspicions that a mixture or substance is a controlled substance, the field/presumptive-tested substance is booked into evidence and set aside for future testing by a specially-equipped lab that can perform much more accurate tests.

3

containing either 5.56 or .223 ammunition. The other magazine was described as smaller, also containing either 5.56 or .223 ammunition. An orange container was located with a large, unspecified quantity of additional 5.56 and .223 ammunition. A camouflage soft-case was located containing various shotgun shells and 9mm ammunition. Inside the middle console the officers found syringes, pipes, a cap with cotton, and a needle containing a substance that field-tested positive for liquid heroin. They also found title paperwork for a house in foreclosure and mail from banks addressed to IDENTITY THEFT VICTIM 1. The Officers also found two checks to VICTIM TITLE COMPANY, described below.

7. BPD case number 2019-00022774 also contains information about an interview with VICTIM LANDLORD 3, whose identity is known to me. VICITM LANDLORD 3 told detectives that on or about May 18, 2019 he met with an individual who purported to identify himself as IDENTITY THEFT VICTIM 1. The individual was seeking information about leasing a property in Thornton, Colorado. VICTIM LANDLORD 3 identified several problems with the application for a lease submitted by the individual and, through an internet search, was able to find and communicate with IDENTITY THEFT VICTIM 1, who told him that the individual seeking the lease was not him.

8. I have reviewed information from Arvada Police Department (hereinafter APD) case number 2019-011125. The information describes a May 24, 2019 complaint by VICTIM LANDLORD 2.

   A. VICTIM LANDLORD 2 told APD that he had received an application for a residential rental property in Arvada, Colorado. The application was completed in IDENTITY THEFT VICTIM 1's name accompanied by a signature; listed IDENTITY THEFT VICTIM 1's Social Security number; login credentials for Credit Karma;[2] employment and personal references. The man purporting to be IDENTITY THEFT VICTIM 1 sent VICTIM LANDLORD 2 a text message with a photo of a Texas Driver's license in IDENTITY THEFT VICTIM 1's name. The man posing as IDENTITY THEFT VICTIM 1 supplied VICTIM LANDLORD 2 with a copy of a paystub from a hospital. VICTIM LANDLORD 2 also located a Facebook profile in IDENTITY THEFT VICTIM 1's[3] name. The man and VICTIM LANDLORD 2 negotiated via the exchange of text messages.

   B. The man purporting to be IDENTITY THEFT VICTIM 1 and VICTIM LANDLORD 2 also had a short email exchange. An APD Officer reviewed the emails, which

---

[2] The website at www.creditkarma.com, which I accessed on October 14, 2019, describes the company as one offering free credit reports and free credit scores as well as other financial services.

[3] An FBI computer scientist has also located a publicly-available Facebook profile in the name of VICTIM DOCTOR. The Facebook profile for VICTIM DOCTOR 1 falsely presents pictures of the man I know to be SHAWN MICHAEL VENCEL as VICTIM DOCTOR 1. The Facebook profile also shows VENCEL with a minor female whose features would be consistent with a child approximately three years old.

4

revealed that the imposter stated, among other things: he was from Houston, Texas; claimed to be an ear, nose and throat physician; discussed his income and living arrangements; and discussed his credit scores as sufficient to make the rent.

        C.        On May 21, 2019, the man purporting to be IDENTITY THEFT VICTIM 1 came to visit the rental property with a three-year old girl and a girlfriend. The man signed a lease using IDENTITY THEFT VICTIM 1's name and provided a cashier's check for $3,000. VICTIM LANDLORD 2 later asked VICTIM LANDLORD 2's mother, who worked at a bank, to authenticate the cashier's check and was informed that it was not legitimate.

        D.        Thereafter, VICTIM LANDLORD 2 used the internet to locate a medical doctor with the name of IDENTITY THEFT VICTIM 1 living in Texas. VICTIM LANDLORD 2 called IDENTITY THEFT VICTIM 1, who denied filling out a lease application or having a cashier's check issued in his name. IDENTITY THEFT VICTIM 1 told VICTIM LANDLORD 2 that someone had been using his identity to buy things and that the case was being investigated by BPD (the same investigation previously described in this affidavit).

        E.        VICTIM LANDLORD 2 was shown a photo array that included a photograph of SHAWN MICHAEL VENCEL. VICTIM LANDLORD 2 identified VENCEL as the man who had presented himself as IDENTITY THEFT VICTIM 1.

9.        An APD Officer called the actual IDENTITY THEFT VICTIM 1 at his office in Texas. IDENTITY THEFT VICTIM 1 stated that his identity had been compromised by individuals in numerous jurisdictions in the United States, including Colorado. IDENTITY THEFT VICTIM 1 stated, among other things, that he did not apply for a rental in Arvada; communicate with VICTIM LANDLORD 2 concerning the rental; sign a lease agreement, or rental documents; or issue a $3,000 cashier's check.

10.        On May 30, 2019, SHAWN MICHAEL VENCEL was arrested by APD Officers when he arrived at VICTIM LANDLORD 2's rental property upon VENCEL's arrival in a Jeep Cherokee. Officers seized two clear baggies and a loaded syringe from the driver's side door of the Jeep Cherokee. The officers later conducted presumptive tests for the seized drugs; which yielded positive results for methamphetamine and heroin.

11.        Also on May 30, 2019, SHAWN MICHAEL VENCEL was interviewed at Arvada Police Department's headquarters after being advised of and waiving his *Miranda* rights. My review of a written report of the interview reveals VENCEL stated the following, among other things:

        A.        VENCEL purchased an identity packet for $1,000 from a man named "AUSTIN" who assured him that the identity did not belong to a real person. As part of the packet, VENCEL received a Texas driver's license in the name of IDENTITY THEFT VICTIM 1 and a credit report with IDENTITY THEFT VICTIM 1's Social Security number.

        B.        SHAWN MICHAEL VENCEL admitted he made a cashier's check and a pay stub by conducting online research and with AUSTIN's assistance. VENCEL attempted to

lease the property in IDENTITY THEFT VICTIM 1's name because VENCEL did not believe that he could secure the lease using his real identity, with his own credit history, because of medical bills related to a cancer diagnosis. VENCEL admitting to representing himself as IDENTITY THEFT VICTIM 1 throughout the leasing process.

   C. VENCEL initially said the drugs found in the Jeep Cherokee belonged to someone else and denied being a drug user. However, VENCEL eventually stated that the drugs were his; that his life had been going downhill since he started using drugs; and that his addiction began with painkillers after arm surgery.

  12. I have reviewed case reports from Boulder Police Department (hereinafter "Boulder PD") case number 19-04950. The reports reveal that on or about May 8, 2019 Officers responded to a call from BANK EMPLOYEE, whose identity is known to me, who reported that SHAWN MICHAEL VENCEL had used fraudulent checks to take approximately $5,387.78 from VICTIM BANK 2, the identity of which is known to me. I went to the website of VICTIM BANK 2 on October 16, 2019. The website contains information that VICTIM BANK 2 is FDIC insured. BANK EMPLOYEE stated VENCEL went to VICTIM BANK 2 on January 29, 2019 to open an account in the name of a business called Mile High Defenders, LLC. On or about February 6, 2019, VENCEL deposited a check in the amount of $2,788.56 at a branch bank in Boulder, Colorado. On or about February 7, 2019 VENCEL deposited another check for $2,500 at another branch in Broomfield, Colorado. VENCEL then made ATM purchases and withdrawals from the account before the bank became aware that the checks were fraudulent. Thereafter, a Boulder PD detective interviewed an employee of the company identified as the paying party of the $2,500 check. The interview revealed that the check in question did not pass through the company's legitimate account. The Boulder PD Detective also learned that the supposed issuing bank for the check in the amount of $2,788.56 was a mobile-only bank (online only) that does not issue paper checks.

  13. A report maintained in case number 19-04950 also showed that on or about April 15, 2019, VENCEL presented two checks from that same mobile-only bank — one for $32,492.89 and one for $18,631.19 — to VICTIM TITLE COMPANY, as part of a real estate closing transaction. The mobile-only bank limits account holders using its checkbook feature to amounts of less than $5,000, thus indicating that these checks were also forged. A lawyer for VICTIM TITLE COMPANY confirmed that the checks were invalid. As set forth above in paragraph 6(F), BPD Officers found these two checks in the fraudulently obtained Ford F150 pickup truck VENCEL drove to VICTIM CAR DEALERSHIP 1 on April 30, 2019.

**II.     There is probable cause to believe that SHAWN MICHAEL VENCEL —a felon prohibited from possessing firearms and ammunition —has possessed firearms and ammunition.**

14.     On September 24, 2019 and October 10, 2019, I caused queries of SHAWN MICHAEL VENCEL's criminal history via the National Crime Information Center and a Colorado Courts database.  The databases revealed that on June 11, 2018, VENCEL was convicted of felony Vehicular Eluding in Colorado state court, Jefferson County.  The underlying offense occurred on August 4, 2017.

15.     As set forth above, I have reviewed a copy of reports from BPD case number 2019-00022774 describing an incident in which SHAWN MICHAEL VENCEL used IDENTITY THEFT VICTIM 1's identity to obtain a loan for the purchase of a car from VICTIM CAR DEALERSIP 1.  As set forth in those reports, Officers seized ammunition, which VENCEL is prohibited from possessing.

**III.    There is probable cause to believe that SHAWN MICHAEL VENCEL obtains controlled substances through fraudulent pretenses and that he obtains other drugs.**

16.     I have reviewed reports from Boulder PD case number 19-05043.  Those reports describe an incident whereby SHAWN MICHAEL VENCEL is alleged to have obtained 120 pills of oxycodone, a controlled substance, by means of a fraudulent prescription.  On or about May 10, 2019, Officers responded to a call from PHARMACIST 1.  PHARMACIST 1 reported that PHARMACY TECH had received a fraudulent prescription in the name of VENCEL RELATIVE 2 from a man identifying himself as VENCEL.  The prescription bore a signature in the name of VICTIM DOCTOR but VICTIM DOCTOR's office manager reported to PHARMACIST that VICTIM DOCTOR did not write the prescription and had not written any prescriptions for VENCEL RELATIVE 2 since March 2019.  PHARMACIST 1 reported that VENCEL had previously filled another prescription for VENCEL RELATIVE 2 in April, 2019.  When officers interviewed VENCEL RELATIVE 2 on May 11, 2019, she stated that she had a prescription for back pain, but had not been to the doctor for about a month.  VENCEL RELATIVE 2 told the Officers that she had found the prescription on an end table in her entryway and had decided to get it filled.

17.     I have reviewed reports from Boulder PD case number 19-07244, which describe an incident in which SHAWN MICHAEL VENCEL is alleged to have obtained oxycodone by means of a fraudulent prescription.  On July 2, 2019, officers responded to a call from PHARMACY EMPLOYEE 2.  PHARMACY EMPLOYEE 2 told the Officers that on June 29, 2019, at approximately 10:00 a.m., a man identified as VENCEL attempted to fill an unsigned prescription for 360 30mg tablets of oxycodone.  PHARMACY EMPLOYEE 2 did not fill the prescription because it had not been signed.  VENCEL returned on June 29, 2019, at approximately 2:00 p.m., with a prescription allegedly signed by VICTIM DOCTOR.  Thereafter, PHARMACY EMPLOYEE 2 filled the prescription.  VENCEL paid $999.99 by check.

18.     On July 1, 2019, at approximately 12:00 p.m., PHARMACY EMPLOYEE 2 was notified that the check used by SHAWN MICHAEL VENCEL to pay for the prescription was not valid.  At that point, PHARMCIST 2 called VICTIM DOCTOR's office manager and learned that VICTIM DOCTOR had not written the prescription.  Moreover, the officer manager advised PHARMACY EMPLOYEE 2 that VENCEL had not been a patient at the practice for at least three years.  PHARMACY EMPLOYEE 2 provided officers with a copy of a Prescription Drug Monitoring Program ("PDMP")[4] report showing that VENCEL had purchased approximately 480 tablets of oxycodone between October 16, 2018 and June 12, 2019.

19.     I have reviewed reports from BCSO case number 19-5379.  The reports reveal that on September 18, 2019, a Detective and Deputies executed a Colorado state search warrant for a 2015 Black Cadillac Escalade registered to SHAWN MICHAEL VENCEL.  BCSO located the vehicle unattended in Boulder County on September 13, 2019.  The Escalade had significant damage to its front left, where it appeared to have hit a tree.  Inside the vehicle, the Detective and Deputies located, among other things: blank checks and printing instructions; a one ounce gold bar in packaging form eBay; blank prescription paper; a torn-up prescription for Oxycodone issued to VENCEL RELATIVE 2; a laptop; a laserjet printer with blank prescription paper in the tray.

**IV.     My interview of SHAWN MICHAEL VENCEL**

20.     On October 10, 2019, I interviewed SHAWN MICHAEL VENCEL at the Boulder County Jail.  Before commencing the interview I advised VENCEL of his *Miranda* rights, confirmed that he understood those rights, and confirmed that he wished to speak with me voluntarily.  During the interview, in sum and substance and in pertinent part, VENCEL told me the following:

A.     SHAWN MICHAEL VENCEL stated that he purchased the identity of IDENTITY THEFT VICTIM 1 on what he called the "dark web," specifically a website called "dream market."  According to VENCEL, he had learned how to access the dark web using what

---

4 The PDMP is an electronic database maintained by the State of Colorado's Board of Pharmacy.  Pursuant to state law all medical providers with an active DEA registration allowing for the prescription of controlled substances are required to register with the program.  As part of the program pharmacies provide information about filled prescriptions for controlled substances, including the date the prescription was dispensed, the name of the patient and the practitioner, the name and amount of the controlled substance, the method of payment, and the name of the dispensing pharmacy.

Additionally, I received medical records from VICTIM DOCTOR's office and PDMP (Colorado Department of Revenue) concerning VENCEL.  The records from VICTIM DOCTOR's office show that VENCEL has not been seen nor prescribed medication by VICTIM DOCTOR/VICTIM DOCTOR's office since April 2016.  Conversely, the PDMP records show that between June 11, 2019 and September 26, 2019, VENCEL obtained 840 doses of oxycodone in Colorado supposedly prescribed by VICTIM DOCTOR.

he called "TOR."[5]  VENCEL said he had been told how to use TOR by a man named AUSTIN HERMSON (phonetic) with whom he had previously been incarcerated.

       B.      SHAWN MICHAEL VENCEL maintained that he did not believe IDENTITY THEFT VICTIM 1 to be a real person.  He stated, instead, that he was under the impression the identity was a fake one that had been "grown" over time using small purchases to establish a credit history.  He called this type of identity a "farmed" identity.  He said that the dream market ad for the identity packet had described it as such.

       C.      SHAWN MICHAEL VENCEL said that the identity packet he purchased gave him a digital list with IDENTITY THEFT VICTIM 1's name, birth date and Social Security number.  He said that he then: took a photo of himself with his phone; emailed it to himself so he'd have it on his computer; and then uploaded the photograph.  About a week later, VENCEL received a Texas driver's license in the name of IDENTITY THEFT VICTIM 1.

       D.      SHAWN MICHAEL VENCEL admitted to being the owner of Mile High Defenders, which he said was the business of modifying and selling Land Rover Defender sport utility vehicles.

       E.      SHAWN MICHAEL VENCEL had conflicting statements about the Ford F150 pickup truck.  At first VENCEL did not remember the presence of any ammunition in its back area.  Later, when I asked if the ammunition was VENCEL's, he responded affirmatively.  Still later VENCEL stated he preferred not to answer questions about the ammunition.

       F.      SHAWN MICHAEL VENCEL is a drug addict.  VENCEL is addicted to heroin and methamphetamines.  VENCEL also takes oxycodone, but noted the drug causes him little effect.

       G.      SHAWN MICHAEL VENCEL met HERMSON while the pair were previously incarcerated together in the Denver County Jail.  VENCEL was unaware of Dream Market prior to being incarcerated.

       H.      SHAWN MICHAEL VENCEL's statements about the possession of firearms were contradictory.  Generally speaking, he denied possessing any firearms.  However, he also admitted that approximately six months ago, he traded an assault rifle to HERMSON in exchange for heroin.  VENCEL's grandmother purchased the assault rifle.  HERMSON told VENCEL the assault rifle was discarded into a dumpster; VENCEL doesn't believe HERMSON discarded the assault rifle.

       I.      VENCEL stated that he paid for IDENTITY THEFT VICTIM 1's identity from Dream Maker via Bitcoin.

---

5 I know, from my training and experience, that this is an acronym for The Onion Router, which is a means used to surreptitiously access the internet.

## THERE IS PROBABLE CAUSE TO BELIEVE THAT THE SUBJECT EMAIL ACCOUNTS CONTAIN EVIDENCE, FRUITS AND INSTUMENTALITIES OF THE SUBJECT CRIIMES

### I.     Background:  The Internet and Email Accounts

21.    The following definition applies to this Affidavit and **Attachments B and D** to this Affidavit.

22.    In this Affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

23.    I am familiar with the Internet (also commonly known as the World Wide Web), which is a global network of computers and other electronic devices that communicate with each other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions, including satellite.  Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state.  Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail").  An individual who wants to use Internet e-mail must first obtain an account with a computer that is linked to the Internet – for example, through a university, an employer, or a commercial service – which is called an "Internet Service Provider" or "ISP" (see definition of "Internet Service Provider" below).  Once the individual has accessed the Internet, that individual can use an e-mail account provided by their ISP or they can use the Internet to connect to public web-based e-mail services to send and receive e-mail.  Web-based e-mail services provide e-mail accounts that may be accessed from any computer that has access to the Internet.  In addition, the individual can access websites using web browsers to view or download content, or make purchases.   The Internet may also be used to access online groups such as chat rooms, websites, social media, newsgroups and video conferencing.

24.    **E-mail Provider**:

a.     In my experience, I have learned that Google and Microsoft provide a variety of on-line services, including electronic mail ("e-mail") access, to the general public. Subscribers obtain an account by registering with Provider.  During the registration process, Provider asks subscribers to provide basic personal information.  Most public providers do not validate the information provided, however.  Nevertheless, the computers of Provider are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for Provider subscribers) and information concerning subscribers and their use of Provider services,

10

such as account access information, e-mail transaction information, and account application information.

   b. In general, an e-mail that is sent to a Provider subscriber is stored in the subscriber's "mail box" on Provider servers until the subscriber deletes the e-mail, or until a preservation letter is sent to the e-mail provider. If the subscriber does not delete the message, or if the e-mail provider preserves the content of the account pursuant to a preservation letter, the message can remain on Provider servers as long as the account remains active.

   c. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Provider servers, and then transmitted to its end destination. Provider often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail, the e-mail can remain on the system indefinitely.

   d. Provider subscribers can also store files, including e-mails, address books, contact or buddy lists, pictures, and other files, on servers maintained and/or owned by Provider.

  25. **Internet Service Providers ("ISPs"):**

   a. ISPs are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system and can access the Internet by using his or her account name and personal password.

   b. ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files. Typically, e-mail that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that e-mail to the intended recipient, usually within an area known as the home directory. Such temporary, incidental storage is defined by statute as "electronic storage," [18 U.S.C. § 2510(17)] and the provider of such a service is an "electronic communications service." An "electronic communications service," as defined by statute, is "any service which provides to users thereof the ability to send or receive wire or electronic communications [18 U.S.C. § 2510(15)]. A

11

service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service" [18 U.S.C. § 2711(2)].

26. **Internet Protocol Address ("IP Address")**: Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of numbers separated by periods; an example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISPs employ dynamic IP addressing, that is they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Typically, users who sporadically access the Internet via a dial-up modem will be assigned an IP address from a pool of IP addresses for the duration of each dial-up session. Once the session ends, the IP address is available for the next dial-up customer. On the other hand, some ISPs, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer. A modem is an electronic device that allows one computer to communicate with another.

27. A host computer is one that is attached to a dedicated network and serves many users. These host computers are sometimes commercial online services, which allow subscribers to connect to a network, which is in turn connected to their host systems. These service providers allow electronic mail service between their own subscribers, and those of other networks or individuals on the Internet.

28. Contact with others online can be either open and anonymous, or private and personal in the form of person-to-person instant messages.

29. Further, the online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. These online storage accounts are often free but can involve a charge. A subscriber assigned a free online storage account frequently can set up such accounts by providing limited identifying information. Any information provided is frequently fictitious in an attempt to preserve the anonymity of the user. Consequently, even if it is known that a particular user is a subscriber of a free online storage service, the service provider frequently will have no records in that subscriber's name. Instead, the online service will only be able to identify files, that are associated with a "login," or unique, user-created identity the subscriber uses to "log on" to the online service. As set forth in more detail below, there is reason to believe that the SUBJECT GMAIL ACCOUNT and SUBJECT OUTLOOK ACCOUNTS contain evidence regarding SHAWN MICHAEL VENCEL's efforts to use the identities of

IDENTITY THEFT VICTIM 1 and 2 to commit the SUBJECT OFFENSES. Such a subscriber can collect, store, view and distribute electronic files directly from the online service. Consequently, files that may be evidence of a crime may also have minimal contact with the subscriber's home computer. The subscriber can also manipulate the files on an online storage service from any computer connected to the Internet. Nonetheless, evidence of an online storage account is often found on a home computer of a user subscribing to such a service. Evidence of an online storage account may take the form of passwords located in encrypted, archived[6], or other files on the user's home computer. Other evidence can also be found through unique software that may exist on a user's home computer that has been developed by the online storage service. This unique software will frequently contain evidence not only of the existence of such accounts, but the login and password.

## II.     SHAWN MICHAEL VENCEL's use of the SUBJECT GMAIL ACCOUNT

30.     The SUBJECT GMAIL ACCOUNT is associated with bank/credit union accounts and a loan that IDENTITY THEFT VICTIM 1 has stated IDENTITY THEFT VICTIM 1 did not create. SHAWN MICHAEL VENCEL has also used the SUBJECT GMAIL ACCOUNT to communicate with others while representing himself to be IDENTITY THEFT VICTIM 1.

A.     Records provided by Key Bank show that on March 29, 2019, savings account number x1258 was opened in IDENTITY THEFT VICTIM 1's name. The SUBJECT GMAIL ACCOUNT is associated with the bank account as a means of contact. IDENTITY THEFT VICTIM 1 has stated that he did not open this account, nor permit anyone to do so utilizing his identity.

B.     Records provided by Elevations Credit Union show that on April 3, 2019, an application for loan number 378575, in the amount of $25,000 was submitted and signed in IDENTITY THEFT VICTIM 1's name. The SUBJECT GMAIL ACCOUNT is listed as a means of contact on the application. IDENTITY THEFT VICTIM 1 has stated that he did not apply for a loan, nor permit anyone to do so utilizing his identity.

C.     SHAWN MICHAEL VENCEL listed the SUBJECT GMAIL ACCOUNT on the application he signed in the name of IDENTITY THEFT VICTIM 1 to obtain the loan at VICTIM CAR DEALERSHIP 1.

D.     SHAWN MICHAEL VENCEL provided VICTIM LANDLORD 3 with a completed rental application identifying the SUBJECT GMAIL ACCOUNT as a means of communicating with him.

E.     SHAWN MICHAEL VENCEL supplied VICTIM LANDLORD 2 with the SUBJECT GMAIL ACCOUNT as a means of communicating with him.

---

6 Archive files are files which generally contain other files in a compressed format. Thus, Archive files may be thought of as containers containing other files. Archive files are commonly referred to as "zip" or "zipped" files.

31. On October 11, 2019 and February 13, 2020, I submitted requests to Google, pursuant to 18 U.S.C. § 2703(f) to preserve the SUBJECT GMAIL ACCOUNT.

32. On November 27, 2019 I obtained an order pursuant to 18 U.S.C. § 2703(d) from the Honorable Scott T. Varholak for the SUBJECT GMAIL ACCOUNT. I served the order on Google that same day. I received a response to the order on January 9, 2020.

33. The records revealed that one of the SUBJECT GMAIL ACCOUNT's enabled services was Google Voice, which I know from experience to be a feature providing telephonic communications including text messaging. The phone number associated with the SUBJECT GMAIL ACCOUNT is 720-725-8189.

34. Also, based on my review of the records, the SUBJECT GMAIL ACCOUNT has been in communication with entities at Elevations Credit Union, such as:

    A. An email sent from the SUBJECT GMAIL ACCOUNT on March 16, 2019, at approximately 11:33 a.m., to an entity known to me as ELEVATIONS CREDIT UNION EMPLOYEE 1 ("ECUE-1").

    B. An email received by the SUBJECT GMAIL ACCOUNT on March 16, 2019, at approximately 4:29 p.m. from ECUCE-1.

    C. An email received by the SUBJECT GMAIL ACCOUNT on April 4, 2019, at approximately 9:18 a.m. from email address Loan_Closing@keybank.com.

35. Email communications from Elevations Credit Union show communications with the SUBJECT GMAIL ACCOUNT. These records included an email sent from the SUBJECT GMAIL ACCOUNT to ECUE-1 on March 16, 2019, at approximately 11:33 a.m. The email's subject line reads [verbatim]: "Re: Xpress App# 264021         [.]" The email states [verbatim]:

> "Thank you so very much for taking the time to help this morning and as soon as I got a little free time Monday I will pop in and get the account opened and shortly after give you a call to confirm.
>
> I am very much looking forward to elevations handling my banking needs as well as helping me plan my future! I hope you have a great rest of your weekend and I will speak with you Monday!
>
> Thanks
>
> 

36. The aforementioned email appears to be in response to an email sent from ECUCE-1 to the SUBJECT EMAIL ACCOUNT on March 16, 2019, at approximately 10:29 a.m. The email states [verbatim]:

14

"Good Morning

In order to finalize the account you will need to stop into a branch and verify yourself with your Current ID and a recent utility bill with your current address. Once we have that I can finish opening the account and we can finalize the credit card as well as the personal loan if you would like to proceed with that.

Thank you and have a great weekend!

[ECUE-1]"

37. The SUBJECT GMAIL ACCOUNT also communicated with entities associated with facilitating the sale of firearms. Specifically, on February 26, 2019, at approximately 2:07 p.m., the SUBJECT GMAIL ACCOUNT received an email from support@gunbroker.com.

38. On February 24, 2020, I visited the website www.gunbroker.com. A section of the website titled "What is GunBroker.com?" states the following [verbatim]: "GunBroker.com is the world's largest online auction site for firearms and hunting/shooting accessories. The GunBroker.com website provides an informative, safe and secure way to buy and sell firearms, ammunition, hunting gear, shooting accessories, vehicles, collectibles and much more online. Third party sellers list items of the site; GunBroker.com serves as the listing service. Other than merchandise bearing its logo, GunBroker does not sell items listed on its website[.]"

39. For all of the reasons set forth above, I submit there is probable cause to believe that the SUBJECT GMAIL ACCOUNT contains evidence, fruits and instrumentalities of the SUBJECT OFFENSES.

### III.  SHAWN MICHAEL VENCEL's use of the SUBJECT SV OUTLOOK ACCOUNT

40. There is also probable cause to believe that the SUBJECT SV OUTLOOK ACCOUNT also contains evidence, fruits and instrumentalities of the SUBJECT OFFENSES.

41. My review of the aforementioned records obtained from Google for the SUBJECT GMAIL ACCOUNT reveals that on the following dates and approximate times, messages were exchanged between the SUBJECT GMAIL ACCOUNT ("SGA") and SUBJECT SV OUTLOOK ACCOUNT ("SSVOA"):

| Date | Time | To | From |
|---|---|---|---|
| March 30, 2019 | 3:59 p.m. | SSVOA | SGA |
| March 30, 2019 | 4:00 p.m. | SGA | SSVOA |
| May 11, 2019 | 7:57 p.m. | SSVOA | SGA |
| May 12, 2019 | 9:08 p.m. | SSVOA | SGA |

42. On February 13, 2020, I submitted a request to Microsoft, pursuant to 18 U.S.C. § 2703(f) to preserve the SUBJECT SV OUTLOOK ACCOUNT.

15

43. On October 16, 2019, the Honorable S. Kato Crews authorized a search warrant for an Apple iPhone cellular telephone collected from SHAWN MICHAEL VENCEL incident to VENCEL's arrest by the Denver Police Department on October 7, 2019. I located the SUBJECT SV OUTLOOK ACCOUNT as one of the user accounts on the Apple iPhone.

### IV.    SHAWN MICHAEL VENCEL's use of the SUBJECT CS OUTLOOK ACCOUNT

44. There is probable cause to believe that the SUBJECT CS OUTLOOK ACCOUNT contains evidence, fruits and instrumentalities of the SUBJECT OFFENSES.

45. I have reviewed reports from BCSO case number 19-5320. The matter concerns BCSO's investigation of SHAWN MICHAEL VENCEL's identity theft and fraudulent use of another IDENTITY THEFT VICTIM 2's identity to purchase a Ducati motorcycle.

46. A BCSO investigative report relates that on September 11, 2019, two BCSO Deputies met with VENCEL RELATIVE 2 at SHAWN MICHAEL VENCEL's residence at 5515 South Boulder Road, (unincorporated Boulder County), 80303. The BCSO Deputies were present at VENCEL's residence to assist VENCEL RELATIVE 2 retrieve items belonging to VENCEL RELATIVE 1. While there, VENCEL RELATIVE 2 provided the BCSO Deputies with documents including an account statement from Ducati Financial Services for a 2018 Ducati motorcycle having account number x3053.

47. I have reviewed the Ducati account statement. The contract start date was July 15, 2019. The account had a balance of $16,084.97. The account was in the name of IDENTITY THEFT VICTIM 2's name, addressed to VENCEL's residence at 5515 South Boulder Road. A payment in the amount of $589.80 was due on September 14, 2019.

48. A BCSO Detective later contacted MOTOCYCLE DEALERSHIP located in Arizona. MOTORCYCLE DEALERSHIP told the Detective that it was an investigating an identity theft related to this account. The motorcycle was not purchased in-person. Rather, the motorcycle was purchased via the telephone and online; MOTORCYCLE DEALERSHIP never had physical contact with IDENTITY THEFT VICTIM 2 nor the individual who submitted the application. Additionally, the motorcycle's purchase was financed via Ducati and accordingly, MOTORCYLE DEALERSHIP received payment funds. I submit there is probable cause to believe that Ducati Financial Services was victimized in this fraudulent scheme.

49. Another document the BCSO Deputies recovered on September 11, 2019, was what appears to be a credit application from CAR DEALERSHP 2. The document was completed in IDENTITY THEFT VICTIM 2's name. Among other information, the document contained the following information for IDENTITY THEFT VICTIM 2: Social Security number; date of birth; current home address as 5515 South Boulder Road; the SUBJECT CS OUTLOOK ACCOUNT; a Colorado driver license having number 92-240-5400.

A. Thereafter, the BCSO Detective identified and interviewed the actual IDENTITY THEFT VICTIM 2. Among other things, IDENTITY THEFT VICTIM 2 told the BCSO Detective, in sum and substance and in pertinent part that (1) her identity had been stolen; (2) in March 2019, her doctor's office notified her that its customers' accounts had been hacked, (3) she first noticed unusual activity involving her credit in June 2019; (4) at an unspecified time, she was notified via the Credit Karma application that a 2019 GMC Sierra automobile was purchased using her identity; (5) she has never been to Colorado nor Boulder County; (6) she has never given anyone permission to finance vehicles in her name; (7) she had no knowledge of the residential address; 5515 South Boulder Road.

50. The BCSO Detective also located Colorado driver's license number 92-240-5400. I have reviewed a copy of the driver's license dossier. The license is associated with an individual known to me as VENCEL's deceased grandfather.

51. To date, the BCSO Detective has been unable to identify any vehicle(s) purchased from CAR DEALERSHIP 2 in IDENTITY THEFT VICTIM 2's name. The BCSO Detective contacted CAR DEALERSHIP 2 who could not locate records regarding CAR DEALERSHIP 2's purchase of a vehicle. CAR DEALERSHIP 2 noted though, that CAR DEALERSHIP 2 sold three franchises to another automobile dealership. The BCSO Detective has not received any additional information from the purchasing dealership regarding such records.

52. I have reviewed reports maintained in Denver Police Department (hereinafter "DPD") case number 19-643038. The matter concerns DPD's investigation of SHAWN MICHAEL VENCEL's fraudulent purchase of a 2019 GMC Sierra at VICTIM CAR DEALERSHP 3 in Denver, Colorado on October 2, 2019. The total sale amount of the 2019 GMC Sierra was $77,987.89. VICTIM CAR DEALERSHP 3 contacted DPD after learning that VENCEL used a fraudulent $40,000 check drawn on a fictitious Charles Schwab account as a down-payment for the vehicle. On October 7, 2019, DPD Officers arrested VENCEL driving the 2019 GMC Sierra for misuse of license plates and other active felony arrest warrants. The 2019 GMC Sierra was impounded incident to VENCEL's arrest. Thereafter, the DPD Detective traveled to the Denver City Impound Lot and saw that the 2019 GMC Sierra had a 2018 Ducati motorcycle [spelled "Docati" in the DPD Detective's report] bearing vehicle identification number ZDM1YBJS4JB013692.

53. On February 19, 2020, I caused a query of the LexisNexis commercial database for information concerning IDENTITY THEFT VICTIM 2. Among other things, the results showed that a 2018 Ducati motorcycle having vehicle identification number ZDM1YBJS4JB013692 was formerly registered to IDENTITY THEFT VICTIM 2 at VENCEL's residence, 5515 South Boulder Road. The motorcycle registration status was expired.

54. On February 24, 2020, I submitted a request to Microsoft, pursuant to 18 U.S.C. § 2703(f) to preserve the SUBJECT CS OUTLOOK ACCOUNT.

**AUTHORIZATION REQUESTS**

55.     I anticipate executing these warrants under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require Google and Microsoft to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachments B and D.  Upon receipt of the information described in Section I of Attachments B and D, government-authorized persons will review that information to locate the items described in Section II of Attachments B and D.

56.     This application seeks warrants to search all responsive records and information under the control of Google and Microsoft, providers subject to the jurisdiction of this Court, regardless of where Google and Microsoft have chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google's and Microsoft's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States. [7]

## **CONCLUSION**

57.     This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

58.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants.

59.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES may be located within the SUBJECT GMAIL ACCOUNT, SUBJECT SV OUTLOOK ACCOUNT and SUBJECT CS OUTLOOK ACCOUNT described in **Attachments A and C**.

---

[7] It is possible that Google or Microsoft stores some portion of the information sought outside of the United States.  In Microsoft Corp. v. United States, 2016 WL 3770056 (2nd Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States. As the Second Circuit decision is not binding on this court, I respectfully request that this warrant apply to all responsive information— including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of Google. The government also seeks the disclosure of the physical location or locations where the information is stored.

60.     I, therefore, respectfully request that the attached warrants be issued authorizing the search and seizure of the items listed in **Attachments B and D**.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*/s Justin Stern*
Special Agent Justin Stern
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me this __th day of February, 2020

_____
HON. SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Bryan David Fields, Assistant United States Attorney.